***********
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Garner and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award, except for minor modifications. Accordingly, the Full Commission affirms the Opinion and Award of Deputy Commissioner Garner, with modifications.
 *********** RULING ON PLAINTIFF'S MOTION FOR ATTORNEY'S FEES PURSUANT TO N.C. GEN. STAT. § 97-88.1
Plaintiff has made motion to the Full Commission for attorney's fees pursuant to N.C. Gen. Stat. § 97-88.1. The Full Commission, in its discretion, finds that defendants reasonably defended this matter. Thus, plaintiff's motion for attorney's fees pursuant to N.C. Gen. Stat. § 97-88.1 is hereby DENIED.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered by the parties as:
 STIPULATIONS
1. Plaintiff was employed by defendant-employer, Statesville Roofing Heating, from 1965 until 1970, and from 1975 to 1983.
2. Plaintiff was employed by defendant-employer, Troutman Roofing, at various times from 1983 until 1988.
3. Defendant-employer, Statesville Roofing Heating, was insured by The Travelers until 1983, and then by Standard Fire Insurance.
4. Defendant-employer, Troutman Roofing, was self insured during the time of plaintiff's employment.
5. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACTS
1. Plaintiff, who was sixty-three at the time of hearing before the Deputy Commissioner, started working for Statesville Roofing in 1965 and left in 1970. He returned to work with the company in 1975 and continued working there until 1983. Plaintiff worked for Troutman Roofing from 1983 until 1988, when he quit due to health problems.
2. Plaintiff worked as a roofer during the entire period that he worked for Statesville Roofing Heating. His job as a roofer was to tear off existing roofs and install new roofs on commercial buildings. Plaintiff worked directly with asbestos products during the entirety of his employment at Statesville Roofing.
3. All the roofs on which plaintiff worked were commercial roofs with "built-up roofing" systems that consisted of several layers of roofing materials on a relatively flat roof. Plaintiff spent approximately two-thirds of his time tearing off old roofs and the remainder of the time putting on new roofs.
4. Plaintiff testified that the insulation, felts, and flashings used in the roofing process contained asbestos. He stated that he had knowledge of the difference between asbestos and non-asbestos products based upon information from company representatives, packaging labeling, and his twenty plus years of experience as a roofer.
5. During his testimony, plaintiff explained at length the procedure for installing a new roof. He had to lay down several layers of various roofing materials. First, he would lay down a fiberboard with tar. Fiberboard is a wood-like material that is approximately four feet by eight feet in size. His next step would be to lay down insulation followed by more tar. Plaintiff would next lay down a base sheet, which is a thick sheet of fiber approximately three feet wide and about one hundred fifty feet in length. Plaintiff had to cut the base sheet with either a knife and/or an electric table saw to fit it to the roof. This process created a lot of dust.
6. After the base sheet was cut for size, plaintiff would apply several layers of roofing felt. The felt comes on rolls and is approximately three feet wide, one hundred fifty feet long, and usually an eighth of an inch thick. He would apply the felt with a felt machine which would unroll the felt and lay it down with asphalt. This machine generated a significant amount of dust.
7. In order to properly fit the felt to the roof's dimensions, plaintiff would cut the felt with a knife. This was a daily activity that created dust. Finally, plaintiff would put tar and gravel on the roof to finish it. Along the edges of the roof, he would install flashing against the metal edges and sides of the roof. The flashing was a similar material to the roofing felt.
8. The first thing plaintiff did when tearing off an old roof is to sweep the gravel off with a gas-powered broom, which would loosen the gravel from the roof. Plaintiff operated this daily on every tear-off job. Although the broom was only meant to take out gravel, it would often tear into the underlying felt. This process was extremely dusty.
9. On every job, plaintiff would also use regular push brooms after the power broom to pick up any gravel that was left. This job was likewise dusty.
10. After the gravel layer was removed, plaintiff would use a gas-powered roof saw to cut the old roofing into large squares. He operated this machine daily on tear-off jobs. This machine had a sharp blade on the front that rotated in a manner similar to a circular saw, and would cut through all the remaining levels down to the metal base of the roof. This machine generated a stream of dust that would blow back onto the plaintiff as he pushed it.
11. Once the roofing was cut into squares, plaintiff would use a tear-off machine, otherwise known as a power claw or roof plow. This machine was gas-powered and had a flat blade out in front of it that went underneath all the levels of roofing and jostled and vibrated back and forth until the square came loose from the building surface. When the roofing layers were free, plaintiff and his co-workers would pick up the material and place it on a buggy or wheelbarrow. This whole process generated a significant amount of dust that plaintiff would breathe.
12. After loading the pieces of roofing on the wheelbarrow, plaintiff would transport the pieces to the edge of the roof and dump them down a chute onto a truck below. He did this almost every day. This act threw dust back onto the plaintiff, causing him to breath it in.
13. After the roofing was removed, there would still be pieces of gravel, felt and insulation left behind. Plaintiff would sweep this up with a push broom and often with a gas-powered leaf blower. These activities were likewise dusty, causing him to breath in the dust.
14. Once all the roofing was removed, it had to be hauled to the dump or landfill. Plaintiff would drive the dump truck to the landfill approximately on a daily basis. At the dump, he had to get out of the truck to open the gates and dump the roofing. The process was very dusty and covered plaintiff and the inside of the truck with dust in which plaintiff breathed.
15. During the entirety of his employment, plaintiff had no breathing protection against dust and particle exposure.
16. Plaintiff offered the testimony of a co-worker, David Moore. David Moore worked for Statesville Roofing for approximately twenty-five years and often worked on the same crew as plaintiff. David Moore corroborated the testimony of plaintiff as to the job duties and amount of dust generated on jobs at Statesville Roofing.
17. Plaintiff also offered the testimony of his former foreman at Statesville Roofing, Hubert Moore, who corroborated the testimony of the plaintiff.
18. Plaintiff testified that on new roofs, they used asbestos every day for the first two or three years of his employment. He also testified that Statesville Roofing frequently required him to tear out asbestos-containing roofs.
19. Based on the evidence of record, the Full Commission finds that plaintiff was exposed to asbestos for more than thirty days in a seven-month period, both on new roofing jobs and tear-off jobs.
20. Plaintiff's co-worker, David Moore, testified that Statesville removed and applied asbestos roofing frequently. Like plaintiff, David Moore could also tell by sight if materials were asbestos-containing. David Moore also corroborated plaintiff's testimony that they could see what type of felt was on old roofs when they cut through it. According to David Moore, defendant, Statesville Roofing, was still tearing off asbestos roofs well into the 1980's. At least 50% of the roofs were asbestos-containing roofs.
21 Plaintiff's foreman, Hubert Moore, testified that he and plaintiff used asbestos products often on a daily basis. Hubert Moore knew the materials contained asbestos based upon his own personal experience as a roofer and a roofing foreman.
22. Plaintiff also called as witness Doug Davidson, a company official from Statesville Roofing. Currently a vice president at the company, Mr. Davidson started working for Statesville Roofing in 1976, and was once plaintiff's foreman and then his field superintendent. Mr. Davidson corroborated plaintiff's testimony, stating that Statesville Roofing frequently used asbestos-containing materials, and that asbestos-containing materials were often removed from old roofs. Mr. Davidson stated that it was likely, if not probable, that plaintiff would have been exposed to asbestos on a daily basis.
23. Statesville Roofing is a member of the National Roofing Contractors Association (NRCA), a trade organization comprised of roofing companies. The NRCA has published manuals setting forth that asbestos was widely used in the roofing industry in such products as felts, bituminous flashings, roof coatings, mastics, cements, shingles, and underlayments. The NRCA literature discusses the propensity for roofing work to create dust, disturb asbestos, and offered recommendations for handling asbestos.
24. In 1985, the EPA published a manual entitled "Guidance for Controlling Asbestos-Containing Materials in Buildings." The manual identifies roofing materials, such as those used by Plaintiff, as asbestos-containing materials.
25. The plaintiff introduced purchase orders showing that Statesville Roofing was in fact purchasing significant quantities of asbestos during the time when the plaintiff worked there.
26. After leaving defendant Statesville Roofing, plaintiff went to work for defendant Troutman as a supervisor. With Troutman, plaintiff was still required to get up on the roofs and help with removals; however, there was no evidence presented at the hearing that asbestos was used on any job that plaintiff worked while employed by Troutman.
27. The Full Commission finds that plaintiff provided sufficient evidence that his use of asbestos-containing products while working for defendant exposed plaintiff to the hazards of asbestos in excess of 30 working days, or parts thereof, within seven consecutive months.
28. The defendants failed to offer any witness that could contradict the testimony of plaintiff and his co-workers.
29. Plaintiff retired in 1988 due to multiple medical problems. He was diagnosed in February 1993 with colon cancer and underwent a colon resection. On July 27, 1998, plaintiff was diagnosed with asbestosis by Ahmed Elnaggar, M.D. Plaintiff was actually a regular patient of Dr. Elnaggar's clinic prior to this litigation and the evaluation was part of that relationship. Dr. Elnaggar ordered a CT scan and referred it for reading by Fred Dula, M.D., a radiologist. Dr. Dula found "interstitial and pleural changes which would be consistent with asbestosis if the patient has had history of asbestos exposure."
30. After reviewing the findings of Dr. Dula, Dr. Elnaggar concluded: "There is evidence of radiographic asbestosis in this gentleman with history of asbestos exposure."
31. Plaintiff had a chest x-ray and another CT scan on July 27, 1998. James Johnson, M.D., read these films and did a B-read on December 20, 1999. On the chest x-ray, he found areas of abnormal scarring in the bases of both lungs consistent with a dust disease.
32. A third reading of plaintiff's CT scan was done on September 23, 1999, by Caroline Chiles, M.D., of Duke University. Dr. Chiles noted: "Pleural plaque formation and evidence of interstitial fibrosis, which is consistent with asbestos exposure and asbestosis in the appropriate clinical setting."
33. L.C. Rao, M.D., also did a B-read on January 22, 2000. He found parenchymal abnormalities consistent with pneumoconiosis. Specifically, he found "t" shaped opacities bilaterally in the lower lung zones and an ILO profusion rating of 1/1. Dr. Rao concluded that the findings were "consistent with the diagnosis of bilateral interstitial fibrosis due to asbestosis."
34. Dr. Elnaggar re-examined plaintiff in November 2000 and re-affirmed his initial diagnosis of asbestosis.
35. On April 29, 1999, Dr. Arthur Frank reviewed plaintiff's medical records. Dr. Frank concluded that plaintiff was suffering from "asbestosis, which has resulted from his occupational exposure to asbestos."
36. Finally, Robert A. Rostand, M.D., performed plaintiff's panel examination on January 28, 2000. In his report to the Industrial Commission on January 31, 2000, Dr. Rostand stated that plaintiff had "[p]robable asbestos-related disease of lung and pleura."
37. At deposition, Dr. Rostand testified that some recent breathing tests shed some doubt on whether there was a restrictive ventilatory defect. He therefore testified that he could not say for certain that it was asbestosis, but that it is "possible." Dr. Rostand did find abnormalities in plaintiff's lungs consistent with asbestosis and possibly attributable to asbestosis.
38. The defendants offered the testimony of Dr. Alexander. Dr. Alexander found interstitial changes in both lung bases. However, Dr. Alexander did not believe that the interstitial changes were caused by asbestosis.
39. The defendant also deposed Dr. Dimeo, who initially read only x-rays and found no disease process. However, Dr. Dimeo then read a CT scan and felt that his conclusions from the x-ray were incorrect. On the CT scan, Dr. Dimeo saw the interstitial changes that plaintiff's physicians had noted. In spite of this, Dr. Dimeo testified that he did not believe the changes were related to asbestosis and could be other ailments, however, he felt that it was possible that the changes were related to asbestosis. Dr. Dimeo testified that he would need other tests and films to determine whether the changes were in fact caused by asbestosis.
40. The parties dispute as to whether plaintiff is suffering from asbestosis. Plaintiff offered numerous physicians, including B-readers, who diagnosed plaintiff with asbestosis. Defendants offered two physicians who both found the abnormalities in plaintiff's lungs. One of those physicians did not believe it was caused by asbestos exposure; the other, Dr. Dimeo, did not have enough evidence or test results to establish that plaintiff has asbestosis. However, Dr. Dimeo did state that it was possible plaintiff suffers from asbestosis. The panel physician also saw the abnormalities and felt that they were consistent with asbestosis. He testified that plaintiff possibly had asbestosis. In interpreting the evidence, the Full Commission gives more weight to the plaintiff's physicians.
41. Plaintiff was diagnosed with stage 3 colon carcinoma in 1993 by Roger Roark, M.D. Plaintiff subsequently had to have his colon removed due to this cancer. On April 29, 1999, Arthur Frank, M.D., reviewed plaintiff's medical records and concluded that plaintiff developed a cancer of the colon, which was a direct result of his occupational exposure to asbestos.
42. The panel physician, Dr. Rostand, noted that plaintiff's colon cancer may have been caused by his exposure to asbestos. In his January 31, 2000, letter to the Industrial Commission, Dr. Rostand noted: "Plaintiff gives a history of carcinoma of colon which is a known complication of exposure to asbestos." Dr. Rostand also commented on the increased risk for colon cancer among asbestos workers in stating:
 I believe that [plaintiff's] occupational exposure to asbestos has placed him at a greater risk of developing the changes noted on high resolution CT scan of chest as well as his colon carcinoma to a greater extent than a member of the general public not so exposed.
43. There is scientific evidence from credible sources, evidencing the relationship between asbestos and colon cancer, as well as an increased risk in asbestos workers over the general population of developing colon cancer. The National Cancer Institute, the American Medical Association, the U.S. Department of Labor, OSHA, NIOSH, and the defendant's own trade organization have all recognized that asbestos can cause colon cancer.
44. The plaintiff has proven by the greater weight of the evidence that his colon cancer was caused by his occupational exposure to asbestos. Therefore, the Full Commission finds plaintiff's colon cancer to be a compensable occupational disease under the Workers' Compensation Act.
45. The only evidence that defendants offered to contradict the link between plaintiff's asbestos exposure and colon cancer was the testimony of Dr. Michael Goodman and Dr. John Craighead. Dr. Goodman testified that plaintiff's colon cancer is not related to his asbestos exposure. He based this opinion on studies he had read that did not support a causal relationship between asbestos and colon cancer. While he admitted that the research was "50-50" in terms of whether there is a link, he sided with the fifty percent that does not believe there is a link.
46. Dr. Craighead also testified in his deposition that asbestos did not cause plaintiff's colon cancer. He claimed he based this opinion on a review of plaintiff's medical records, as well as various epidemiological studies. Dr. Craighead testified that there were "rather minimal amounts" of literature to support a link between asbestos and colon cancer. Dr. Craighead's opinions are afforded little weight because he disagrees with all noted authorities on the subject of colon cancer and asbestos exposure.
47. Dr. Goodman's and Dr. Craighead's testimony is in direct contradiction to a wide body of literature from well-recognized institutions, including the National Cancer Institute, the U.S. Department of Labor, and OSHA among others, which all cite a causal relationship between asbestos exposure and colon cancer. Therefore, the Full Commission affords little weight to the testimony of Dr. Goodman and Dr. Craighead.
48. One of defendant's other experts, Dr. Dimeo, admitted in his report that there is a link between colon cancer and asbestos exposure. The defendant has three physicians who have given three conflicting opinions about the link between colon cancer and asbestos exposure. The Full Commission finds that the greater weight of the evidence supports that plaintiff is suffering from colon cancer caused by his exposure to asbestos while employed by Statesville Roofing.
49. In an attempt to refute plaintiff's evidence that he was suffering from an asbestos-related illness, defendants offered the testimony of an industrial hygienist, William Dyson. The defendants offered Mr. Dyson's testimony on the issues of the amount of asbestos to which the plaintiff was exposed and whether plaintiff was exposed to airborne asbestos at a sufficient dose to cause his asbestosis. To accomplish this purpose, Mr. Dyson referenced studies published by the National Roofing Contractors Association (hereinafter referred to as the "NRCA report"). Mr. Dyson used the NRCA report, and other unidentified air sampling studies and medical articles to come to the conclusion that any roofing jobs that plaintiff did for Statesville Roofing would not have created sufficiently high levels of asbestos to cause asbestosis. Because Mr. Dyson's opinion is based upon a review of published research and not upon any personal research or observation of the presence of asbestos within the roofing industry, the Full Commission affords little weight to his testimony.
50. Plaintiff offered the testimony of William Ewing, an expert in industrial hygiene. In the past, he was the director of EPA's Asbestos Information Center. He also has done work as a consultant for OSHA related to asbestos standards. Mr. Ewing served on the Public Policy Dialogue Committee in 1989 and 1990 for OSHA and EPA to help them revise their asbestos standards. He also worked on the Regulatory Negotiation Committee for the writing of the Asbestos Hazard Emergency Response Act regulations. Further, Mr. Ewing was a peer reviewer for the revision of the National Emissions Standard for Hazardous Air Pollutants Asbestos Standard, and was a member of the National Asbestos Council where he served on the board of directors as treasurer, and as chairman of several committees.
51. Mr. Ewing has prior experience in evaluating or examining roofing cases. On several occasions, he evaluated workers' exposures to asbestos from roofing activities as part of his work as an industrial hygienist. Mr. Ewing specifically has measured exposures during asbestos roofing removal projects. He testified that determining asbestos exposures for roofers and, particularly, evaluating plaintiff's case is something that he normally does as an industrial hygienist.
52. Mr. Ewing felt that the exposure suffered by the plaintiff would have been a "significant exposure" and likely would have exceeded OSHA's current permissible exposure level for asbestos. Mr. Ewing also stated that Statesville Roofing would have been in violation of OSHA regulations during the time when plaintiff worked there. Based upon his personal research of asbestos in the roofing industry, the Full Commission affords greater weight to the testimony of Mr. Ewing as opposed to defendant's witness, Mr. Dyson.
53. The Plaintiff made a claim for permanent and total disability. Dr. Rostand, the panel physician, found plaintiff was "totally disabled on the basis of his numerous medical problems." Dr. Rostand stated that plaintiff's medical problems included asbestosis and colon cancer. Dr. Rostand diagnosed plaintiff with a severe Class IV breathing impairment, after finding that he was breathing at only half the normal breathing rate.
54. Plaintiff quit work due to breathing problems and subsequently went on social security disability. He also had physical limitations due to his breathing problems.
55. Plaintiff's wife, Charlotte Moore, testified regarding plaintiff's breathing problems and the extent to which she had to care for him.
56. Defendant has offered no evidence to contradict the testimony that plaintiff is totally and permanently disabled.
57. The plaintiff, as stated, last worked full-time in 1987, when he earned approximately $5,762.88. This yields a compensation rate of $73.89 per week.
58. Both plaintiff and his wife testified that he cannot accomplish basic everyday tasks on his own, including dressing or bathing himself. Plaintiff's wife testified that for the last eight years, she has spent approximately six hours a day helping take care of her husband. The Full Commission finds there to be sufficient evidence of record to support a need for attendant care.
59. Bruce Holt, a registered nurse rehabilitation consultant and an expert in life care planning, testified about the cost of care in the Statesville area. He is certified as a life planner through the Commission on Disability and Examiner Certification. Mr. Holt prepared a report on plaintiff's case, dated November 29, 2001. He surveyed various health care agencies in the area and came up with a range of charges for the type of care that Mrs. Moore gives to her husband. Mr. Holt testified that family members get paid anywhere from $6 to $8.50 an hour in different cases depending on what is agreed upon by all parties for that kind of care.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Plaintiff was last injuriously exposed to the hazards of asbestos in excess of 30 working days, or parts thereof, within seven consecutive months. This last injurious exposure of plaintiff occurred in 1983, while employed with Statesville Roofing. N.C. Gen. Stat. § 97-57, Barber v. Babcock WilcoxConstruction Co., 101 N.C. App. 564, 400 S.E.2d 735, 736 (1991). Plaintiff's date of death is February 1, 2003.
2. Carrier The Travelers Insurance Company was on the risk at the time of plaintiff's last injurious exposure and is, therefore, liable for payment of compensation due plaintiff pursuant to the Act. N.C. Gen. Stat. § 97-57.
3. Plaintiff contracted asbestosis and pleural disease as a result of his employment with defendant-employer. These are occupational diseases due to causes and conditions characteristic of and peculiar to his employment with defendant-employer that are not ordinary diseases of life to which the general public is equally exposed. N.C. Gen. Stat. § 97-53(24).
4. Plaintiff is entitled to compensation for damage to each lung pursuant to N.C. Gen. Stat. § 97-31(24).
5. Plaintiff is entitled to compensation for damage to his colon pursuant to N.C. Gen. Stat. § 97-31(24).
6. Plaintiff is entitled to all medical treatment resulting from his compensable occupational disease to the extent that such treatment is designed to effect a cure, give relief, or lessen this period of disability. N.C. Gen. Stat. §§ 97-25 and 97-25.1.
7. Plaintiff also suffered from colon cancer as a result of his asbestos exposure. Cancer is not a specifically enumerated occupational disease under N.C. Gen. Stat. § 97-53. As a result, it falls under the catchall provision of N.C. Gen. Stat. §97-53(13). The provision defines occupational diseases as "any disease which is proven to be due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation, or employment, but excluding all ordinary diseases of life to which the general public is equally exposed outside of the employment." For a disease to be an occupational disease, it must be (1) characteristic of persons engaged in a particular trade or occupation in which the claimant is engaged; (2) not an ordinary disease of life to which the general public is equally exposed with those engaged in that particular trade or occupation; and (3) there must be a causal connection between the disease and the claimant's employment. Hansel v. ShermanTextiles, 304 N.C. 44, 52, 283 S.E.2d 101, 105-106 (1981). Therefore, plaintiff is entitled to compensation for the loss of his colon.
8. Plaintiff is entitled to have additional panel examinations for determination of impairment related to asbestosis. N.C. Gen. Stat. § 97-63.3.
9. An employee is totally and permanently disabled if he is unable to earn the same wages that he had earned before his injury. The employee may meet this burden in one of four ways: (1) the production of medical evidence that he is physically or mentally, as a consequence of the work related injury, incapable of work in any employment; (2) the production of evidence that he is capable of some work, but that he has, after a reasonable effort on his part, been unsuccessful in his effort to obtain employment; (3) the production of evidence that he is capable of some work but that it would be futile because of preexisting conditions, i.e., age, inexperience, lack of education, to seek other employment; or (4) the production of evidence that he has obtained other employment at a wage less than that earned prior to the injury. Russell v. Lowes Prod. Distrib., 108 N.C. App. 762,425 S.E.2d 454 (1993). It is clear from plaintiff's medical evidence that plaintiff is totally and permanently disabled as a result of his impairment. He retired due to his breathing problems. These problems are now so severe, that plaintiff cannot return to reasonable employment.
10. As a result of the admittedly compensable injury, plaintiff is entitled to have defendants pay for unskilled attendant care services for six hours per day, seven days per week at the prevailing hourly rate from the date of this Opinion and Award. The hourly reimbursement rate may be increased periodically, as the prevailing wage increases in the market place. Plaintiff is entitled to have the defendants pay for services as may be provided by his wife, Charlotte Moore, for so long as she is fit and able to provide them, at a rate of $6.00 per hour. N.C. Gen. Stat. §§ 97-2(19), 97-25.
11. In the event defendants retain private attendant care services through either an individual or an agency to provide services for the plaintiff, or defendants provide some other type of respite care on a periodic basis for Mrs. Moore, and said services are provided for less than six hours per day on a seven day per week basis, then defendants shall pay the difference between those hours and the six hour per day, seven day per week standard to Mrs. Moore for the attendant care services she continues to provide for her husband.
 *****
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay to plaintiff in lump sum compensation in the amount of $40,000 for injury to both his lungs due to asbestosis.
2. Defendants shall pay to plaintiff in lump sum compensation in the amount of $20,000 for injury to his colon due to asbestos-related colon cancer.
3. Defendants shall pay for all medical expenses incurred or to be incurred by plaintiff as a result of his compensable injury for so long as such evaluations, treatments and examinations may reasonably be required to effect a cure, give relief and/or lessen plaintiff's period of disability.
4. Defendant's shall pay to plaintiff's counsel a reasonable attorney fee in the amount of twenty-five percent (25%) of the compensation approved and awarded for plaintiff. The attorney's fee shall be deducted from the compensation due plaintiff and shall be paid directly to plaintiff's attorney.
5. Defendants shall pay compensation to plaintiff's wife, Charlotte Moore, for attendant care services provided on a six hour per day, seven day per week basis at the previously determined $6.00 per hour. Defendants may provide services as outlined in Conclusions of Law numbers 10 and 11, and if so, must pay the actual cost of providing attendant care.
6. Defendants shall pay the costs due the Commission.
This 8th day of June 2004.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER